**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**


**TARA D. WILLIAMS**                                                    **PLAINTIFF**


**v.**                          **NO. 3:20-cv-00281 PSH**


**KILOLO KIJAKAZI, Acting Commissioner**                    **DEFENDANT**
**of the Social Security Administration**


## MEMORANDUM OPINION AND ORDER


In this case, plaintiff Tara D. Williams ("Williams") maintains that the findings of an Administrative Law Judge ("ALJ") are not supported by substantial evidence on the record as a whole.[1] Specifically, Williams maintains that her residual functional capacity was not properly assessed. It is her contention that the assessment does not adequately account for her severe pain.

---

[1]      The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id. "'Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law.'" See Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) (quoting Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted)).

The record reflects that Williams was born on October 14, 1978, and was thirty-eight years old on October 25, 2016, the amended alleged onset date.[2] In her application for disability insurance benefits, she alleged that she became disabled as a result of, inter alia, her severe pain.

Williams has experienced pain in her neck, shoulders, and back since well before the amended alleged onset date.[3] She fell down stairs in November of 2005 and required back surgery to repair a ruptured disc and "broken spinous process." See Transcript at 477. She fell down stairs again in November of 2011 and required back surgery to repair ruptured discs and remove a bone spur. See Transcript at 477.

---

[2]     The alleged onset date in this case is a bit confusing. In Williams' application for disability insurance benefits, she alleged that she became disabled beginning on April 24, 2014. The ALJ observed at the outset of the administrative hearing, though, that there is "a prior unfavorable decision dated October 19 of [2016]." See Transcript at 54. Given his observation, the alleged onset date was amended to October 25, 2016. See Transcript at 15, 55. In the ALJ's written decision, he initially noted that the alleged onset date had been amended to October 25, 2016, see Transcript at 15, but then repeatedly noted that the alleged onset date is April 24, 2014, see Transcript at 16, 18, 34. In Williams' brief, she too noted that the alleged onset date is April 24, 2014. See Docket Entry 18 at CM/ECF 1, 5. Because the issue of reopening her prior claim for benefits was not addressed during the administrative proceeding, the Court overlooks the aforementioned references to April 24, 2014, as the alleged onset date and finds that the alleged onset date is October 25, 2016.

[3]     The parties agree that Williams was insured for purposes of disability insurance benefits through December 31, 2019. Thus, the relevant period for her claim is from October 25, 2016, i.e., the amended alleged onset date, through December 31, 2019, i.e., the date last insured. In addressing Williams' claim, the ALJ considered evidence from before the relevant period. The Court will do likewise but will do so only briefly in order to place Williams' condition in an historical context. In addition, the Court will limit its recital of the evidence to that which is relevant to her assertion of severe pain, which forms the basis of her challenge to the ALJ's findings.

Between July of 2013 and the amended alleged onset date, Williams sought medical attention on numerous occasions for the pain in her neck, shoulders, and back.[4] Her pain was aggravated by movement but relieved with rest, changing positions, and medication. Her gait and station were typically normal. She received epidural steroid injections, see Transcript at 479, and underwent an anterior cervical discectomy and fusion at C5-C6 in April of 2014, see Transcript at 432-433.[5] She was prescribed pain medication that included Tramadol, Flexeril, and Cymbalta, and she reported some benefit from Tramadol.

A typical progress note during the period between July of 2013 and the amended alleged onset date is one from January 13, 2016. See Transcript at 495-499. In the note, Williams' history of present illness was recorded to be as follows:

---

[4]     See e.g., Transcript at 587-589 (07/24/2013), 477-478 (11/08/2013), 479 (12/19/2013), 639-642 (01/27/2014), 801-804 (02/12/2014), 799-800 (03/05/2014), 790-792 (05/13/2014), 623-626 (05/23/2014), 787-789 (06/17/2014), 782-785 (09/23/2014), 777-781 (12/10/2014), 480-484 (07/02/2015), 485-489 (07/29/2015), 490-494 (10/21/2015), 612-614 (10/09/2015), 608-611 (12/28/2015), 772-776 (03/31/2015), 767-771 (05/05/2015), 495-499 (01/13/2016), 500-504 (02/09/2016). The recitals of dates in this Memorandum Opinion and Order are not intended to be complete catalogs of every presentation Williams made for, or testing in connection with, her complaints of pain in her neck, shoulders, and back.

[5]     The anterior cervical discectomy and fusion, sometimes noted as an "ACDF," proved largely successful as the results of subsequent testing were typically within normal limits, and she reported improvement. See Transcript at 790-792, 787-789, 462-465, 467. The record also indicates that during the period, Williams underwent breast reduction surgery in an attempt to relieve her back pain. See Transcript at 62, 1248.

**History of present illness ...**
The patient is a 37 female who presents for a recheck of low back pain. The onset of the low back pain has been gradual and has been occurring in a persistent pattern for 4 years. The course has been increasing. The low back pain is described as a mild dull aching. The low back pain is described as being in the lower back. The pain radiates to the lateral aspect of right leg and right foot. The back pain is aggravated by straining at stool, twisting, lifting, sitting, standing and walking. The back pain is relieved by bedrest, change in position and medication.

Additional reasons for visit:

Recheck of Thoracic spine intake is described as the following:
The pain is located in the upper back and in the mid back. The pain radiates to the left shoulder, left arm, right shoulder, and right arm. The patient describes the pain as throbbing ... The symptoms occur constantly. The episodes occur daily. Symptoms are exacerbated by lifting and bending. Symptoms are relieved by rest and opioid analgesics.

Recheck of Neck pain is described as the following:
The onset of the neck pain has been gradual and has been occurring in an intermittent pattern for 1 year. The course has been constant. The neck pain is described as mild. Note for "Neck pain": pain radiates into bilat hands and causes numbness and tingling which comes and goes.

See Transcript at 495. Williams rated her pain level as four on a ten point scale. She had normal ambulation and did not require an assistive device to walk. A physician's assistant diagnosed, in part, neck pain, low back pain, and cervical disease. Medication was prescribed, and Williams was encouraged to re-establish care at a pain management clinic.

Williams also underwent extensive medical testing of her neck, shoulders, and back between July of 2013 and the amended alleged onset date.[6] For instance, the results of a 2013 cervical spine MRI showed "[n]o significant central or neuroforaminal stenosis" and "[m]ild degenerative disc disease at C5-C6 with mild diffuse disc bulging." See Transcript at 453. The results of a 2013 lumbar spine MRI showed facet arthropathy at L3, L4, and L5 "producing some spinal stenosis but no foraminal stenosis." See Transcript at 478. At L5-S1, there was a "protrusion of the posterior disc producing small spinal stenosis and mild stenosis of the nerve root on the right side." See Transcript at 478.

The results of a 2014 cervical spine CT scan showed, inter alia, "C5-C6 level left paracentral disc protrusion impinging the left anterior margin of the spinal cord" and "[m]ild C7-T1 facet joint hypertrophy without encroachment." See Transcript at 458. The results of a 2014 lumbar spine

---

[6]     See Transcript at 450 (08/09/2013, diagnostic imaging of lumbar spine); 451 (08/09/2013, lumbar spine MRI); 452 (10/17/2013, diagnostic imaging of cervical spine); 453 (10/17/2013, cervical spine MRI); 455-456 (02/26/2014, CT scan of lumbar spine); 457-458 (02/26/2014, CT scan of cervical spine); 459 (04/28/2014, diagnostic imaging of cervical spine); 460 (04/28/2014, diagnostic imaging of cervical spine); 461 (04/28/2014, diagnostic imaging of cervical spine); 462 (05/13/2014, diagnostic imaging of cervical spine); 463 (06/17/2014, diagnostic imaging of cervical spine); 464 (07/08/2014, diagnostic imaging of cervical spine); 465 (08/12/2014, CT scan of cervical spine); 466 (11/13/2014, diagnostic imaging of left shoulder); 467 (11/13/2014, CT scan of cervical spine); 468-469 (03/19/2015, CT scan of cervical spine); 470-471 (04/29/2015, CT scan of cervical spine).

CT scan showed, <u>inter</u> <u>alia</u>, mild disc bulges at L3-L4 and L4-L5 and intervertebral osteochondrosis and facet joint hypertrophy at L5-S1. <u>See</u> Transcript at 456. A 2014 x-ray of her left shoulder was unremarkable. <u>See</u> Transcript at 466.

After the amended alleged onset date, Williams continued to seek medical attention for the pain in her neck, shoulders, and back.[7] Her pain continued to be aggravated by movement but relieved with rest, changing positions, and medication. Her gait and station were typically normal. She received injections in her cervical, lumbar, and sacral portions of her spine, <u>see</u> Transcript at 540, 551, 567, 1039, 1135-1137, and underwent a spinal cord simulator trial, <u>see</u> Transcript at 1174-1178, 1221-1223. She continued to use medication that included Flexeril and Lyrica.

---

[7]     <u>See</u> Transcript at 654-657 (10/28/2016), 505-509 (10/28/2016), 762-766 (12/05/2016), 510-515 (12/20/2016), 647-650 (12/28/2016), 439-443 (12/29/2016), 365-368 (12/30/2016), 757-761 (01/05/2017), 516-522 (02/02/2017), 752-756 (03/01/2017), 523-531 (03/30/2017), 685-688 (04/03/2017), 532-534 (04/06/2017), 535-543 (05/19/2017), 544-549 (06/22/2017), 550-552 (07/27/2017), 425-429 (08/09/2017), 374-375 (08/09/2017), 553-559 (08/17/2017), 444-447 (09/13/2017), 448-450 (10/01/2017), 560-565 (10/18/2017), 566-569 (10/26/2017), 960-968 (11/15/2017), 402-403 (11/15/2017), 570-576 (12/13/2017), 1023-1028 (02/08/2018), 1029-1035 (02/14/2018), 1036-1041 (04/17/2018), 940-943 (05/15/2018), 958-959 (05/16/2018), 1244-1245 (09/13/2018), 1242-1243 (10/11/2018), 1081-1084 (10/15/2018), 1179-1184 (02/07/2019), 1174-1178 (02/18/2019), 1170-1173 (02/25/2019), 1167-1168 (03/14/2019), 1163-1166 (03/25/2019), 1156-1162 (04/15/2019), 1135-1137 (06/13/2019), 1147-1152 (06/25/2019), 1238-1241 (07/08/2019), 1224-1227 (07/13/2019), 1141-1143 (07/30/2019), 1236-1237 (08/05/2019), 1138-1140 (08/13/2019), 1059-1061 (08/29/2019), 1128-1134 (09/16/2019).

Selected progress notes from the period after the amended alleged onset date provide some insight into the location, duration, frequency, and intensity of Williams' pain. For instance, on August 9, 2017, she saw Dr. Lucas Bradley, M.D., ("Bradley") for an evaluation. See Transcript at 374-375. Williams' history of present illness was recorded to be as follows:

> Mrs. Williams is a pleasant 38-year-old female referred to this clinic for the evaluation of back and leg pain, as well as neck pain. Neck pain is concerned, she has had previous ACDF, which is healed well. She continues to have some numbness and tingling in her upper extremities. MRI, or myelogram of her cervical spine. Her back appears to be the primary issue, she has permanent nerve damage in her right leg, which creates severe numbness. This numbness is progressed to burning in her right leg, it appear to be an L5 and S1 distribution. It is very bothersome. Her main issue, that affects her daily life appears to be her back pain. She feels as though it catches, and slips, on a daily basis. This can cause severe back pain, which immobilizes her. She has had numerous injections, including SI injections, with minimal relief. She has had 2 surgeries on her back, both of which were non-instrumented. Her most recent MRIs 2013, demonstrated moderate canal narrowing, with foraminal stenosis, most significant on the right side at L5-S1. She also has endplate changes, most severe at L5-S1.

See Transcript at 374. Bradley performed a physical examination and found, in part, that Williams had 5/5 strength in her left lower extremity but only 4/5 strength in her right lower extremity. Bradley diagnosed low back pain and offered the following observations:

> ... [s]he has aggressive degenerative changes at L4-5 and L5-
> S1. This partially related to previous surgeries, and partially
> normal aging degeneration. I do believe the back pain is coming
> post of disc degeneration, facet arthropathy, and micro-
> instability likely due to previous surgeries. I believe she would
> benefit from fusion at L4-S1. The leg pain and numbness on the
> right side is difficult to evaluate. It is long-standing, and when
> the recent changes in sensation it may be related to foraminal
> stenosis at L5-S1 or possibly L4-5. However, could be
> progressive changes in the paresthesias that she has had fairly
> long-standing. I have offered her surgery in the form of an L4-
> S1 fusion with wide decompression. I will need a CT scan of her
> lumbar spine before we proceed. ... As far as her neck is
> concerned, I would recommend CT myelogram versus MRI to
> better assess her nerve roots. Should she develop worsening
> symptoms in the upper extremities and are consistent with
> myelopathy or focal weakness, I would recommend more urgent
> assessment. She would like to wait at this time, her current
> pain management is providing significant relief.

See Transcript at 375.

Approximately three weeks later, Williams underwent a transforaminal lumbar interbody fusion at L4-S1. See Transcript at 379-381. Bradley represented in a procedure note that the fusion was warranted because "[i]maging demonstrated severe degenerative changes at L5-S1," there was "concern for stenosis at L4-5," and Williams had failed to respond to "conservative measures." See Transcript at 379. Three months later, he observed that she was "doing well" and was "improved" despite some pain and numbness. See Transcript at 405.

On February 14, 2018, Williams saw Dr. Ross Andreassen, M.D., ("Andreassen") as a part of continued pain management. <u>See</u> Transcript at 1029-1035. The progress note contains, in part, the following observations:

> Patient returns regarding neck pain and bilateral upper extremity symptoms. Upper extremity symptoms radiate into the ulnar aspect of the forearms and hands. She underwent a C5-C6 ACDFF in 2014. She is currently a patient at the OMC pain clinic. She has not yet pursued injection trials. Cervical MRI (02/02/2017) and flexion/extension x-rays (01/05/2017) were reviewed, with images and reports. Postoperative changes are noted at C5-C6 consistent with prior ACDFF. Fixation hardware appears in good position and secure. Solid fusion is suggested. Canal decompression at the surgical level appears adequate. No other sites of significant canal stenosis are noted. Degenerative disc/joint disease is demonstrated, with mild anterior encroachment at C3-C4. Flexion/extension x-rays demonstrate no gross instability. EMG dated 02/28/2017 was reported as normal. Nerve conduction studies dated 02/23/2017 were also normal. Neck range of motion is mildly diminished in rotation to the right. She has a well-healed left anterior neck surgical scar. Hoffman sign is negative bilaterally. Tinel sign is negative at the wrists and elbows. Phalen's/carpal compression testing elicits ulnar nerve distribution symptoms in the hands, right greater than left. Gait is not spastic.

<u>See</u> Transcript at 1029-1030. A physical examination was largely unremarkable. Andreassen's diagnoses included cervical disc disease, fibromyalgia, and degeneration of the lumbar intervertebral disc. He continued her on medication that included Lyrica.

On August 14, 2018, Williams saw Dr. Samuel Hester, Ph.D., ("Hester") for a mental diagnostic evaluation. See Transcript at 1042-1050. Hester's observations included the following finding: "[Williams] was able to drive short distances and always accompanied" and "was reportedly able to perform many [activities of daily living] but she does need assistance with bathing and grooming." See Transcript at 1047.

As a part of Williams' continued pain management, she also saw Dr. Ryan Krafft, D.O., ("Krafft"). At a February 7, 2019, presentation, Williams' "pain details" were recorded to be as follows:

> ... They report increased pain and state pain is barely controlled but current medication regiment is adequate. Denies any side effects from medications, but does report some limited activity and enjoyment of life due to pain. The patient complains of pain in lower back. The patient has been experiencing this pain for greater than 1 year. She reports onset of pain gradually over time without significant initiating factor. The patient describes her pain as constant with intermittent flare ups. The pain is aching, burning, ramping, spreading, stabbing, tender and throbbing. **The pain radiates to right upper extremity**. Patient says, at its worse her pain is 8/10, at its least it is 3/10, on an average about 6/10, and right now it is 6/10. The pain is made worse by increased activity and sometimes by no particular reasons, whereas it gets better by rest, taking medications, applying cold, applying heat and massage. Other associated symptoms/problems are as follows: difficulty performing daily activities, frustrated because of pain, difficulty sleeping and dependance on other for activity of daily living.

See Transcript at 1179. (Emphasis in original). A physical examination revealed, in part, that palpation and hyperextension of Williams' lumbar spine produced pain, and she had a greatly reduced range of motion in all directions. She had an antalgic gait but was nevertheless able to "heel walk" and "toe walk." See Transcript at 1182. She had 4/5 strength in her lower extremities. Krafft's diagnoses included chronic pain syndrome, an abnormal gait, and failed back syndrome. He continued her on hydrocodone, Flexeril, and Lyrica.

Williams continued to see Krafft throughout 2019. A progress note from a September 16, 2019, presentation, or after approximately seven months of treatment, reflects that Williams' condition remained largely unchanged. Although her range of motion in her lumbar spine was improved, she continued to have pain, tightness, and tenderness. The note reflects that she had failed "conservate treatment (drug therapy, activity modifications, and physical therapy)" and was being evaluated for "sacroiliac joint syndrome." See Transcript at 1132. Krafft noted that Williams had "focal pain in her right sacroiliac joint, with corresponding tenderness, and has had relief with sacroiliac joint injections in the past." See Transcript at 1133. He believed it would be reasonable to "get her set up with a repeat injection, ..." See Transcript at 1133.

Williams also underwent medical testing of her neck, shoulders, and back after the amended alleged onset date.[8] For instance, the results of 2016 cervical spine MRI showed shallow disc bulging and mild facet arthropathy at C3-C4 and C4-C5, but there was no significant spinal canal or neural foraminal stenosis. See Transcript at 472. At C5-C6, a postoperative fusion was noted, but there was no significant spinal canal or neural foraminal stenosis. The results of a cervical spine MRI in 2017 were similar, showing, inter alia, mild disc bulging at C3-C4 and C4-C5 but an otherwise normal cervical spine. See Transcript at 474. The results of a 2019 CT scan of her cervical spine were interpreted as follows:

> Soft tissue thickening anterior to the thecal sac at the L5-A1 level and the nerve root sheaths fill with contrast and pass through this tissue. I am not sure if this is scar tissue or at least some disc material but does not displace the thecal sac posteriorly to some degree.
>
> The L4-5, L3-4, and L2-3 levels are essentially normal.

See Transcript at 1230.

---

[8]      See Transcript at 472 (11/18/2016, cervical spine MRI), 368 (12/30/2016, CT scan of cervical spine), 473 (01/05/2017, cervical spine testing), 474 (02/02/2017, cervical spine MRI), 755 (02/23/2017, nerve conduction study), 1016 (02/28/2017 EMG), 370 (08/18/2017, CT scan of lumbar spine), 390-392 (08/29/2017, lumbar spine testing), 398-399 (11/15/2017, cervical and lumbar spine testing), 1205 (05/16/2018, lumbar spine testing), 1207-1209 (10/09/2018, EMG/nerve conduction studies of upper and lower extremities), 1228 (07/22/2019, lumbar spine testing), 1230-1232 (08/01/2019, CT scan of cervical spine).

The results of 2017 lumbar spine CT scan showed no acute process, but there was "degenerative disc narrowing at L5-S1 with no significant spinal stenosis" and "mild bilateral foraminal stenosis at this level." See Transcript at 370. Spinal stenosis at L4-5 from a moderate concentric disc bulge was noted, as was a somewhat small spinal canal.

On October 9, 2018, Williams underwent an EMG/nerve conduction study. The results of the study were abnormal and indicated "radiculopathic axon loss process involving the anterior primary rami of the right S1 nerve root." See Transcript at 1207.

Williams completed a pain form and a function report in connection with her application for disability insurance benefits. See Transcript at 235-236, 237-244. In the documents, she represented, inter alia, that she experiences a continual, sharp, aching pain in her shoulders, down both her arms, and into her legs. She estimated that she can stand/walk and sit for about ten to twenty minutes before experiencing pain. A typical day consists of staying home, napping for several hours, and performing some household chores. Williams represented that she requires assistance attending to her personal care; can perform simple house and yard work; and enjoys reading, sewing, and watching television. She also represented that she requires an assistive device to walk.

The record contains a summary of Williams' work history. <u>See</u> Transcript at 198-205. The summary reflects that she had meaningful FICA earnings between 1999 and 2009 and between 2011 and 2013.

Williams testified during the administrative hearing. <u>See</u> Transcript at 58-80. She testified that she stopped working in 2014 as a result of a herniated disc in her cervical spine. When asked to identify her "most troubling or work prohibitive impairment," she testified as follows: "The sit, excuse me, the sitting, standing for long periods of time. I am totally numb on the, my lower extremities on the right side which creates muscle spasms and all kinds of other ailments that kind of keep me from properly performing any kind of dutiful work." <u>See</u> Transcript at 62. Williams experiences migraine headaches that are brought on by her physical pain. She can sit for about seven to ten minutes before she must stand. She requires the assistance of a caregiver and housekeeper to attend to her personal care and housekeeping. Williams does not drive an automobile often and can only do so for short distances. She cannot shop for groceries. Williams uses a cane to walk, which she testified was prescribed by a Dr. Green, and has used a neck and back brace at times. Williams could not explain why some of her medical records contain the notation "[i]ndependent with activities of daily living." <u>See</u> Transcript at 76.

The ALJ found at step two of the sequential evaluation process that Williams' severe impairments include "lumbar degenerative disc disease status/post laminectomy, discectomy, fusion and spinal cord stimulator placement; migraine headaches; cervical degenerative disc disease status/post discectomy and ACDF; fibromyalgia; failed back syndrome; chronic pain syndrome; and right shoulder bursitis." See Transcript at 18. The ALJ assessed Williams' residual functional capacity and found that she is capable of performing a reduced range of sedentary work.[9] As a part of so finding, the ALJ opined that Williams misrepresented her activities of daily living to Hester as Williams "drives independently, attends church each Sunday, shops, pays bills, does laundry and dishes, attends sporting events, ... travels to Branson, [Missouri] and to a cabin in Tennessee, as well as caring for her two children. See Transcript at 32. The ALJ found at step four that Williams cannot return to her past relevant work. At step five, the ALJ found that a hypothetical individual with Williams' limitations could work other jobs. The ALJ therefore concluded that Williams was not under a disability as defined by Social Security Act.

---

[9]     The ALJ found that Williams is capable of performing sedentary with additional physical and mental limitations. With respect to Williams' additional physical limitations, the ALJ found that Williams "can never climb ladders, ropes, or scaffolds. [She] can occasionally climb ramps and stairs, stoop, crouch, kneel, and crawl; and can occasionally reach overhead bilaterally." See Transcript at 20.

Williams' sole contention is that her residual functional capacity was not properly assessed. Specifically, she maintains that the assessment does not adequately account for her severe pain. She notes that "from a logical standpoint, it is entirely reasonable to expect that an individual who has endured three lumbar surgeries and a lumbar spinal cord stimulator along with a cervical procedure would have difficulties maintaining any position for long." See Docket Entry 18 at CM/ECF 18.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The ALJ cannot rely solely upon the medical evidence in making the assessment; instead, the ALJ must evaluate all of the evidence—including the non-medical evidence—in making the assessment. See Grindley v. Kijakazi, 9 F.4th 622 (8th Cir. 2021). As to the claimant's subjective complaints, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce pain or other symptoms and, if so, evaluate the intensity, persistence, and limiting effects of the pain or other symptoms. In evaluating the intensity, persistence, and limiting effects of the claimant's pain or other symptoms, the ALJ must consider all the evidence, including evidence of the following:

(1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment a claimant uses or has used to relieve pain or other symptoms ...; and (7) any other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

See Social Security Ruling 16-3p. See also 20 C.F.R 404.1529; Polaski v. Heckler, 751 F.3d 943 (8th Cir. 1984).

The question for the ALJ was not whether Williams experiences pain in her neck, shoulders, and back. The question was the extent to which Williams' pain limits her ability to perform work-related activities. The ALJ noted his obligation to consider the consistency of her pain or other symptoms pursuant to Social Security Ruling 16-3p and 20 C.F.R. 404.1529. He found that her statements concerning the intensity, persistence, and limiting effects of her pain or other symptoms were not "fully consistent with the record as a whole," see Transcript at 22, and found that she is capable of performing a reduced range of sedentary work. He could find as he did as his findings are supported by substantial evidence on the record as a whole. The Court so finds for the following reasons.

First, the ALJ could and did find that Williams' medically determinable impairments could reasonably be expected to produce pain or other symptoms. Specifically, the ALJ could and did find that Williams' pain or other symptoms are caused by her back impairments, which Bradley believed to be Williams' "primary" or "main" issue, see Transcript at 374; migraine headaches; fibromyalgia; failed back syndrome; chronic pain syndrome; and right shoulder bursitis. See Transcript at 22.

Second, the ALJ evaluated the evidence relevant to the intensity, persistence, and limiting effects of Williams' impairments. The ALJ did so, in part, by evaluating the voluminous medical evidence. See Transcript at 21-28. He properly noted her repeated presentations for the pain in her neck, shoulders, and back. Her pain was aggravated by movement but relieved with rest, changing positions, and medication. She sometimes had pain upon palpation and hypertension of her lumbar spine, a reduced range of motion in her back, and less than full strength in her lower extremities. On other occasions, though, she had normal muscle tone and normal, or near-normal, muscle strength. See Transcript at 759, 764, 958, 960, 1236, 1238, 1240, 1242. She sometimes had an antalgic gait, but Krafft observed that Williams could nevertheless "heel walk" and "toe walk." See Transcript at 1182.

The ALJ noted the results of the extensive medical testing of Williams' neck, shoulders, and back. See Transcript at 22-28. Although the results of the testing showed, inter alia, degenerative disc disease, and Williams had an abnormal EMG/nerve conduction study in 2018, the results were otherwise less than compelling. For instance, the results of a 2017 cervical spine MRI showed, in part, mild disc bulging at C3-C4 and C4-C5 but an otherwise normal cervical spine. The results of a 2017 lumbar spine CT scan showed, in part, "degenerative disc narrowing at L5-S1 with no significant spinal stenosis" and "mild bilateral foraminal stenosis at this level." See Transcript at 370. Spinal stenosis at L4-5 from a moderate concentric disc bulge was noted, as was a somewhat small spinal canal.

The ALJ noted Williams' 2005 lumbar surgery, her 2011 lumbar surgery, and her 2014 anterior cervical discectomy and fusion. See Transcript at 21. He noted her 2017 transforaminal lumbar interbody fusion, see Transcript at 21, six months after which she was doing "quite well," see Transcript at 958. The ALJ also noted Williams' 2019 spinal cord stimulator placement, see Transcript at 21, four months after which she was "doing well from a spine standpoint," see Transcript at 1240. He also noted her multiple injections, see Transcript at 23-27, which produced a reduction in her pain level, see Transcript at 1135.

19

The ALJ evaluated the evidence relevant to the intensity, persistence, and limiting effects of Williams' impairments by also evaluating the non-medical evidence. He could and did find that with respect to her daily activities, she can drive independently, attend church, do some laundry and dishes, occasionally attend sporting events, travel for vacations, and help care for her two children. <u>See</u> Transcript at 19-21, 32. His finding has support in the record as she reported regularly attending church and her children's sporting events, <u>see</u> Transcript at 77-78, and progress notes from after the amended alleged onset date reflect that she reported being able to perform many activities of daily living, particularly with the spinal stimulator, <u>see</u> Transcript at 1157, 1147-1148, 1238, 1129.[10]

The ALJ noted the location, duration, frequency, and intensity of Williams' pain or other symptoms and the factors that precipitate and aggravate her pain and other symptoms. For instance, he noted her testimony as to the symptoms caused by her degenerative disc disease, <u>see</u> Transcript at 21, and he recited progress notes from the medical record in which she described the pain she was experiencing and the movement that aggravated her pain, <u>see</u> Transcript at 22, 24-29.

---

[10]   As the Court has noted, Williams could not explain why some of her medical records contain the notation "[i]ndependent with activities of daily living." <u>See</u> Transcript at 76.

The ALJ noted the type, dosage, effectiveness, and side effects of the medication Williams has taken, or is taking, to alleviate her pain or other symptoms. For instance, he recited progress notes from the medical records in which her medication regiment included the use of Tramadol, Flexeril, Cymbalta, and Lyrica, see Transcript at 23-28, and the notation that the use of Flexeril and Lyrica was believed to be "reasonable," see Transcript at 28.

The ALJ also noted other factors concerning Williams' functional limitations and restrictions due to pain or other symptoms. For instance, he noted that she reported using "several assistive devices in the home," see Transcript at 27, and progress notes reflect that she sometimes used an assistive device to walk. At other times, though, she required no assistive devices and even reported at an August of 2019 presentation that she did not require a cane to walk. See Transcript at 1236.

Williams challenges the evaluation of her activities of daily living, taking the position that the ALJ erroneously diminished the credibility of Hester's opinions as to Williams' activities of daily living. The ALJ could find as he did with respect to Hester's opinions. An acceptable interpretation of the evidence is that Williams' activities of daily living are not as limited as she reported to Hester.

The question at bar is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence." See Dillon v. Colvin, 210 F.Supp.3d 1198, 1201 (D.S.D. 2016). In fact, "[a] reviewing court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision." See Id. (internal quotations and citations omitted). See also Grindley v. Kijakazi, 9 F.4th at 627 ("If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, the court must affirm the [ALJ's] decision.")

In this case, the evidence is capable of more than one acceptable interpretation. The ALJ evaluated all the evidence and interpreted it in one of the acceptable manners, specifically, that Williams retained sufficient residual functional capacity to perform a reduced range of sedentary work. Although the Court might have found differently had it been presented with the question in the first instance, the ALJ could find as he did.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Williams' complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 4th day of October, 2021.

_____
UNITED STATES MAGISTRATE JUDGE